**Alan McSURELY and Margaret McSurely**

v.

**John J. McCLELLAN et al., Appellants.**

**No. 73–1991.**

United States Court of Appeals, District of Columbia Circuit.

Argued 26 Nov. 1974.

Decided 28 Oct. 1975.

Raymond D. Battocchi, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., Irving Jaffe, Acting Asst. Atty. Gen., Robert E. Kopp, Irwin Goldbloom and David J. Anderson, Attys., Dept. of Justice, were on the brief for appellants.

Morton Stavis, Newark, N. J., with whom Nancy Stearns, New York City, and Daniel Crystal, Paterson, N. J., were on the brief for appellee.

Before DANAHER, Senior Circuit Judge, and LEVENTHAL and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This appeal is from an order entered on 12 June 1973 by the District Court in an action brought by Alan and Margaret

McSurely against Senator John L. McClellan and three of his aides in their individual capacity.[1] The plaintiffs' (appellees') suit seeks damages of $800,000 for alleged violations of their constitutional rights arising from the defendants' (appellants') use of materials taken from the home of the plaintiffs in an unlawful search and seizure by agents of the Commonwealth of Kentucky on 11 August 1967.[2] The District Court's order denied the defendants' motion to dismiss or for summary judgment, and allowed the suit to proceed over the defendants' objections.

Those objections, now made the principal points on appeal, are that further proceedings would violate defendants' right under the Speech or Debate Clause of the Constitution[3] not to be questioned outside Congress for their legislative acts, and that the use in a Congressional investigation by the defendant Senator and his committee aides of documents unlawfully seized by others was not barred by the Fourth Amendment. On these legal issues we largely agree with the defendants and therefore reverse the District Court; we remand, however, for the determination of certain disputed factual issues which conceivably might show plaintiffs to have a cause of action.

## I. Factual Background

Reference is made to this court's earlier opinions in *United States v. McSurely*[4] and *McSurely v. McClellan*[5] for a detailed exposition of the factual background of this lawsuit. In brief, in 1967 Alan and Margaret McSurely were field organizers for the Southern Conference Educational Fund, Inc., in Pike County, Kentucky. Alan McSurely was also connected with the National Confer-

ence of New Politics and Vietnam Summer, both unincorporated associations. On the night of 11 August 1967, under authority of a warrant charging seditious activities against the Commonwealth of Kentucky in violation of KRS 432.040, officials of Pike County arrested the McSurelys and seized a large volume of books, posters, pamphlets, and other private and published documents found in their home.

On 14 September 1967, in response to a complaint filed by the McSurelys, a three-judge District Court in Kentucky held KRS 432.040 facially unconstitutional and enjoined state prosecution of the McSurelys.[6] In its order the court directed the Commonwealth Attorney for Pike County, Thomas B. Ratliff, to hold in safekeeping the materials taken from the McSurelys' house, pending his possible appeal of the court's decision. Shortly thereafter, the Assistant Counsel to the Permanent Subcommittee on Investigations ("Subcommittee") of the Senate Committee on Government Operations ("Committee"), Lavern Duffy, contacted Ratliff by telephone to inquire about the seized items. Ratliff had previously made a public announcement that the materials would be made available to Congressional committees.

As a result of the Duffy telephone call, in early October 1967 John Brick, a Subcommittee investigator, visited Ratliff in Pikeville. After confirming with Ratliff that the McSurely material contained information relating to the activities of a number of organizations in which the Subcommittee was interested, Brick examined and made notes on the seized items. In addition, he was provided with copies of 234 of the documents, which he took with him on his return to

---

1. This case has been before this court on one prior occasion, *McSurely v. McClellan*, 138 U.S.App.D.C. 187, 426 F.2d 664 (1970), as has been the related case of *United States v. McSurely*, 154 U.S.App.D.C. 141, 473 F.2d 1178 (1972).

2. *See McSurely v. Ratliff*, 398 F.2d 817 (6th Cir. 1968); *McSurely v. Ratliff*, 282 F.Supp. 848 (E.D.Ky.1967).

3. U.S.Const. art. I, § 6, cl. 1.

4. 154 U.S.App.D.C. 141, 143–47, 473 F.2d 1178, 1180–84 (1972).

5. 138 U.S.App.D.C. 187, 189–90, 426 F.2d 664, 666–67 (1970).

6. *McSurely v. Ratliff*, 282 F.Supp. 848 (E.D. Ky.1967).

Washington. Subsequently, on 16 October 1967, at the direction of Senator McClellan, Chairman of the Subcommittee, Brick prepared subpoenas for certain of the McSurely materials in Ratliff's possession which the Senator had determined would be of value to the Subcommittee investigation of riots which occurred in Nashville, Tennessee, in April 1967.

When the plaintiffs received the subpoenas, they filed motions with the three-judge court seeking orders blocking Ratliff from releasing the seized materials to the Subcommittee and directing him to return those materials to the McSurelys. This action culminated in a decision by the Sixth Circuit Court of Appeals in July 1968 that the documents must be returned to the McSurelys, but without prejudice to the right of the Subcommittee to proceed with the enforcement of its subpoenas.[7] The lower court thereupon directed Ratliff to return all of the seized materials on 8 November 1968. On the same day the McSurelys received the xerox copies of 234 documents which Brick had taken with him to Washington.

Upon receipt of these materials the McSurelys were immediately served with new Subcommittee subpoenas similar to the original ones. They appeared before the Subcommittee on 4 March 1969, but refused to produce the subpoenaed materials. Pursuant to a Senate resolution, the McSurelys were indicted for contempt of Congress on 29 August 1969; they were tried and convicted on 20 June 1970. On appeal, however, this court reversed that conviction.[8] The majority[9]

of the court took the position that the exclusionary rule applied to proceedings before Congressional committees as well as to criminal prosecutions and, therefore, the Subcommittee's subpoenas were invalid as the fruit of an unlawful search and seizure.

The lawsuit from which the instant appeal derives was originally filed on the same day, 4 March 1969, that the McSurelys appeared before the Subcommittee. It was substantially modified by the plaintiffs in May 1971 when they sought and received permission to file an amended and substituted complaint. The defendants filed a motion to dismiss or for summary judgment which was heard and submitted for decision on 28 October 1971. When the Supreme Court decided *Gravel v. United States*,[10] and *United States v. Brewster*,[11] the parties submitted supplemental memoranda analyzing the relationship of those decisions to this case. On 12 June 1973 the District Court entered a one-sentence order denying defendants' motion. The defendants then moved for reconsideration of the Court's order—or certification under 28 U.S.C. § 1292(b) of the issue of their official immunity—based in part upon the Supreme Court's recent decision in *Doe v. McMillan*.[12] The Court denied this motion on 9 July 1973. This appeal followed.

II. *Jurisdiction*

Before discussing the substantive validity of the District Court's order denying defendants' motion to dismiss or for summary judgment, we must deter-

---

7. *McSurely v. Ratliff*, 398 F.2d 817 (6th Cir. 1968).

8. *United States v. McSurely*, 154 U.S.App.D.C. 141, 473 F.2d 1178 (1972).

9. The writer of this opinion concurred only in the result reached by the majority. Arguing that application of the exclusionary rule to legislative hearings was wholly inappropriate, he voted to reverse the McSurelys' conviction, not because the subpoenas in question were based upon information obtained in an unlawful search, but because the Government had

failed to make the necessary showing that all of the subpoenas' demands were pertinent to the Subcommittee's legitimate inquiry. *Id.* at 157–67, 473 F.2d at 1194–1204.

10. 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

11. 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

12. 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1974).

mine whether this court has jurisdiction to review that order. Normally a denial of a motion for summary judgment is not appealable.[13] That is, it does not qualify as a "final decision" for the purposes of 28 U.S.C. § 1291.[14] The Supreme Court, however, has repeatedly emphasized that section 1291 must be given a "practical rather than a technical construction."[15] If the order of the District Court in this case has "sufficient indicia of finality," it is appealable even though it is not a decision which ends the action.[16]

We have already had occasion to apply this principle in the instant case, although to a different order of the District Court.[17] That order of 18 December 1969 denied a motion made by the plaintiffs to stay—pending the resolution of this civil action—the criminal contempt proceedings which had been instituted against the McSurelys for their failure to comply with the Senate Subcommittee's subpoenas. (Significantly, the complaint in this case at that time included a prayer for preliminary and permanent injunctions to bar a prosecution for contempt.) When the McSurelys appealed the District Court's order, the Government argued to this court that we had no jurisdiction under section 1291 to review that ruling. We responded:

> At the core of the appellants' complaint is the claim that their rights will be irretrievably lost if the McSurelys are forced to trial on the criminal charges, regardless of the outcome. If the claim of a right to be free from prosecution is not determined before the criminal trials take place, it will be for all practical purposes lost.[15]

[15] We are not suggesting, of course, that this claim may not be raised as a defense to the criminal prosecutions. . . . Such a defense, if successful, would vindicate the McSurelys' right to be free from conviction, but the greater right—to be free of prosecution—could not be made whole.[18]

In sum, the court found the District Court's order sufficiently determinative of the McSurelys' constitutional claim to render the order a "final decision" on its merits. Significantly, we made clear that the jurisdictional issue raised by the appeal was separate from the question of the substantive validity of the McSurelys' contention:

> Our conclusion that the order involved is appealable in view of the nature of appellants' claims is not undercut by the fact that we do not adopt such of their contentions as we find open in the present posture of the case. Appellants present the claim that they will be subject to constitutional injury no matter what the course of events in the criminal proceeding. We have jurisdiction to consider that claim, even though we conclude, as will appear, that the criminal proceeding can be conducted so as to avoid trampling on appellants' constitutional rights.[19]

The constitutional claim made by the defendants in the instant appeal, arising from the District Court's denial of their motion for summary judgment, is based upon the clause providing that "for any Speech or Debate in either House, they [Members of Congress] shall not be questioned in any other Place."[20] This Speech or Debate Clause is read

---

13. See, e. g., Ercona Camera Corporation v. Brownell, 100 U.S.App.D.C. 394, 246 F.2d 675 (1957). See generally 10 C. Wright & A. Miller, Federal Practice and Procedure § 2715 (1973).

14. The rationale for this rule is the salutary one of preventing piecemeal litigation and eliminating the delays that are occasioned by interlocutory appeals.

15. Cohen v. Beneficial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

16. Brown Shoe Co. v. United States, 370 U.S. 294, 308, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

17. McSurely v. McClellan, 138 U.S.App.D.C. 187, 426 F.2d 664 (1970).

18. Id. at 191, 426 F.2d at 668.

19. Ibid.

20. U.S.Const. art. I, § 6, cl. 1.

broadly to effectuate its purpose of protecting the independence of the legislative branch.[21] Its office is to shield Members of Congress not only from the consequences of litigation but also from the burden of defending themselves.[22] It blocks all inquiry into their legislative acts and the motivation for those acts.[23] Moreover, "the Speech or Debate Clause applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself." [24]

The defendants argue that their constitutional right to be free from questioning as to their legislative acts will be "irretrievably lost" if discovery is allowed to proceed in this case and they are subjected to the burden of a trial. Relying upon our earlier opinion finding appealable the District Court's refusal to stay criminal proceedings against the McSurelys, the defendants contend that the order of the District Court at issue here is effectively a "final decision" for the purposes of section 1291. The plaintiffs, on the other hand, argue that the defendants' assertion that further proceedings will deprive them of their rights under the Speech or Debate Clause begs a question which requires a plenary trial. Not every act by a legislator or a legislator's aide is a constitutionally protected "legislative act." Without adversary proceedings to resolve the disputed issues of fact in this case, the plaintiffs urge, this court cannot pass upon the defendants' claims of legislative immunity.

We find the argument of defendants to be the more persuasive. Plaintiffs' argument, as will be discussed more fully below, goes not so much to this court's jurisdiction to review the District Court's order as to the merits of the defendants' claim of immunity. Essentially, plaintiffs challenge the validity of defendants' claim that they are entitled to relief from suit as a matter of law. We emphasized in our earlier opinion in this case that the question of appealability does not turn on the correctness of an appellant's claim (at least so long as it is not frivolous). Rather, the issue is whether his right to appellate review of that claim—whether ultimately successful or not—will be effectively lost if jurisdiction is denied.

The defendants assert that their actions in this case are completely insulated from judicial inquiry by the Speech or Debate Clause. That claim is clearly not frivolous. If they are required to respond to interrogatories, answer questions put in depositions, and defend themselves in a plenary trial covering the whole of their activities, they will have been forced to surrender their claimed privilege regardless of its validity.[25] An appeal from the final judgment in the action will come too late to give meaningful review of their claim. We hold, therefore, that as to the defendants' assertion of immunity from inquiry, the District Court's order denying summary judgment was a "final decision" under 28 U.S.C. § 1291.

We are highly cognizant, however, of one implication of the District Court's

**21.** *United States v. Johnson,* 383 U.S. 169, 180, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966).

**22.** *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).

**23.** *United States v. Brewster,* 408 U.S. 501, 525, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

**24.** *Gravel v. United States,* 408 U.S. 606, 618, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

**25.** It might be argued, by analogy to the jurisdictional rule generally applied to mandamus petitions, that the defendants cannot claim irreparable injury arising from the District Court's order so long as the possibility remains open that it can be disobeyed and reversed on appeal from a contempt citation. Cf. *United States v. Ryan,* 402 U.S. 530, 532, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971); *United States v. Anderson,* 150 U.S.App.D.C. 336, 464 F.2d 1390 (1972). However, in a case such as this—involving the invocation of a privilege central to the separation of powers between the legislative, executive, and judicial branches—we think that requiring a United States Senator to hold himself in contempt in order to protect that privilege would be "a course unseemly at best." *Nixon v. Sirica,* 159 U.S. App.D.C. 58, 65 n. 21, 487 F.2d 700, 707 n. 21 (1973).

order denying summary judgment, *viz.,* that there are disputed questions of fact which remain to be resolved in this case. As will be demonstrated in Parts IV and V below, some of these factual disputes are made immaterial by our determination of the legal issue of legislative immunity. Even accepting as accurate the plaintiffs' allegations in these areas, the legislative activities which they address were fully protected under the Speech or Debate Clause. As to these activities, the defendants are entitled to summary judgment in their favor.

■ Other activities allegedly engaged in by the defendants, however, may not be so protected. Plaintiffs urge the necessity for full discovery and a plenary trial to develop the facts as to these activities. Although there is little evidence in the record to support many of the plaintiffs' most critical factual claims, the District Court's blanket denial of summary judgment leaves all of these claims in issue. We are in no position to second-guess the court's first-hand determination that further proceedings are required to ascertain the truth of the plaintiffs' allegations. Nevertheless, in view of the ease with which discovery into alleged conduct of the defendants not protected by the Speech or Debate Clause can infringe the defendants' right to be free from inquiry into legislative acts which are so protected, we think it necessary to give the District Court some guidance in confining plaintiffs' discovery, and any trial which may follow, to conduct of the defendants outside the constitutional fold.

### III. *Pleadings*

Plaintiffs' amended and substituted complaint names as defendants, in addition to Senator McClellan and John Brick,[26] Jerome Adlerman and Donald O'Donnell, the General Counsel and Chief Counsel of the Senate Subcommittee.[27] Damages in the sum of $200,000 per defendant are sought for alleged violations of the plaintiffs' rights under 42 U.S.C. §§ 1981, 1983 and 1985, and under the First, Fourth, Fifth, and Fourteenth Amendments of the Constitution.[28] The primary activities which the plaintiffs claim give rise to these violations are as follows:

(1) The unlawful search and seizure of the McSurelys' books and papers by Kentucky authorities.

(2) The inspection by Brick of those unlawfully seized materials.

(3) The transport by Brick of copies of 234 documents to Washington.

(4) The inspection of some or all of those 234 copies by the staff of the Subcommittee.

(5) The use of the copies, and Brick's inspection of the documents themselves, as the basis for issuance of subpoenas for some of the documents.

(6) The procurement of Contempt of Congress citations against the plaintiffs by consciously withholding from the Senate the facts relating to the challenged subpoenas.

(7) The dissemination of some or all of the 234 copies obtained by Brick to persons or agencies outside of the Subcommittee—particularly the Internal Revenue Service.[29]

---

**26.** John Brick died during the pendency of this appeal, and we asked the parties to submit memoranda on the question whether plaintiffs' action against Brick survived his death. Our remand does not completely foreclose the possibility that Brick may be found to have engaged in otherwise actionable activity; however, the charges which we find potentially viable are at present totally devoid of evidentiary backing. The defendants do not challenge the survival of plaintiffs' action against Brick, and we are reluctant to decide this complex question without a more complete factual record.

**27.** The complaint also includes as a defendant Commonwealth Attorney Ratliff. It does not appear, however, that the plaintiffs have pursued their action against Ratliff. In any event, the Government does not represent Ratliff and the instant appeal is not taken on his behalf. Def.Br. at 11 n. 8.

**28.** Jurisdiction is founded on 28 U.S.C. §§ 1331, 1332, and 1343(3) and (4) (1970).

**29.** The claim that the copies of the 234 documents may have been turned over to the Internal Revenue Service was not made in the plaintiffs' amended complaint. Indeed, it did

All of these activities are alleged to have been engaged in by the defendants, in conspiracy with Commonwealth Attorney Ratliff, for the purpose of harassing and intimidating the plaintiffs, harassing the organizations (and members thereof) with which the plaintiffs may have associated, and driving the plaintiffs out of Pike County.

As to the factual accuracy of plaintiffs' allegations, the defendants argue first that there is no evidence that any of the defendants participated in any way in the raid on the plaintiffs' house.[30] Second, they contend that none of the 234 copies of documents taken to Washington by Brick was shown to anyone, inside or outside the Subcommittee, except Senator McClellan. The copies were kept in a locked file until returned to the McSurelys. No evidence has been submitted by the plaintiffs to the contrary.

■ As we noted above, however, this court is not equipped to resolve the factual disputes raised by the pleadings. If this appeal were one taken by the plaintiffs from a grant of summary judgment in favor of the defendants, we might be disposed to find that the plaintiffs had not met their burden of setting forth "specific facts showing that there is a genuine issue for trial."[31] In view of the great deference due the District Court's apparent determination that

---

not arise until shortly before oral argument on this appeal. At that time, the disclosure of certain documents of the IRS, made as the result of a suit under the Freedom of Information Act, indicated that beginning on 28 August 1968 there were contacts between members of the staff of the Permanent Subcommittee on Investigations and the IRS concerning Subcommittee access to IRS materials. Such access was allowed the Subcommittee following a formal request by Senator McClellan. Later, on 1 August 1969, Commissioner Randolph Thrower of the IRS sought permission to inspect the files of the Subcommittee with regard to certain organizations. Senator McClellan granted that request on 8 August 1969.

We granted the plaintiffs leave to lodge these recently disclosed materials with the court and invited a response from the defendants. The defendants asserted that Brick had returned the copies of 234 documents to Thadeus Scott, Commonwealth Detective, on 14 August 1968 (although they were not actually returned to the McSurelys until 8 November 1968), and received a receipt for the return. According to Brick's testimony in the criminal contempt trial of the McSurelys, he never copied any of the documents, he never retained any, and the Subcommittee retained none. In sum, even if the IRS did gain access to the Subcommittee's files at some point after 28 August 1968, the McSurelys could not have been harmed thereby, because no copies of their papers were in the files.

Plaintiffs, in their reply to defendants' response, dispute both that the documents were turned over to Scott on 14 August 1968 and that no copies were made. We are in no position to resolve this factual dispute. To the extent that it is material to that part of plaintiffs' case which survives our partial grant of

summary judgment to the defendants, we leave resolution of this question to the District Court on remand.

**30.** As rebuttal evidence, defendants point to plaintiffs' stipulation that Lavern Duffy, Assistant Counsel to the Subcommittee and its chief investigator, had no contact with Ratliff prior to their telephone conversation more than three weeks after the Ratliff raid. App. 20. Further, they point to this court's statement in *United States v. McSurely* that it was a result of that conversation that Brick traveled to Pikeville. 154 U.S.App.D.C. 141, 145, 473 F.2d 1178, 1182 (1972). Finally, in an affidavit attached to the defendants' motion for dismissal or summary judgment, Senator McClellan flatly denied any participation of any sort in the raid. App. 60–61.

**31.** Fed.R.Civ.P. 56(e) provides in pertinent part that a party opposing a summary judgment motion supported by affidavits "may not rest upon the mere allegations . . . of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, *if appropriate*, shall be entered against him." (Emphasis added.) Plaintiffs did not file any cross-affidavits in response to the defendants' motion. Nevertheless, trial court judges are given wide latitude in determining whether entry of summary judgment in a particular situation is "appropriate." 10 C. Wright & A. Miller, Federal Practice and Procedure 719–22 (1973). Particularly in a case such as this, where the plaintiffs have not had an opportunity to take discovery, it would appear within the District Court's discretion to refuse to grant the defendants' request for resolution of all material factual issues in their favor.

none of these critical factual questions can be answered without further inquiry, however, we must proceed on the assumption that they remain open issues.

As to the legal merit of the plaintiffs' case, the defendants do not contest that they might be liable for damages if they in fact promoted or participated in the unlawful raid on the McSurelys' home. Generally, however, with regard to the rest of the plaintiffs' allegations, the defendants contend (1) they are immune from liability, and inquiry, under the Speech or Debate Clause and (2) their acts were not unlawful, particularly in view of the Supreme Court's recent decision in *United States v. Calandra.*[32]

## IV. *The Speech or Debate Clause*

### A. *General Principles*

 "Without exception, our cases have read the Speech or Debate Clause broadly to effectuate its purposes," wrote Chief Justice Burger for the Court most recently in *Eastland v. United States Servicemen's Fund.*[33] The rationale behind the Court's liberal construction of the provision was explained in *Gravel v. United States*[34] as follows:

The Clause also speaks only of "Speech and Debate," but the Court's consistent approach has been that to confine the protection of the Speech or Debate Clause to words spoken in debate would be an unacceptably narrow view. Committee reports, resolutions,

and the act of voting are equally covered; "[i]n short, . . . things generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn v. Thompson*, 103 U.S. 168, 204 [26 L.Ed. 377] (1881), quoted with approval in *United States v. Johnson*, 383 U.S. [169], at 179 [86 S.Ct. 749, 15 L.Ed.2d 681] [1966]. Rather than giving the clause a cramped construction, the Court has sought to implement its fundamental purpose of freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator.[35]

The Court explained further in *United States v. Brewster* :[36]

It is beyond doubt that the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts.[37]

Moreover, in both *Gravel* and *Doe v. McMillan*,[38] the Court made clear that for the purpose of construing the constitutional provision a Member of Congress and his agent or assistant are to be " 'treated as one.' "[39] (That is, a Congressional aide is included within the scope of immunity afforded by the Speech or Debate Clause to the extent that his conduct would be a privileged "legislative act" if performed personally by a Congressman.)[40] Finally, any ques-

**32.** 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

**33.** 421 U.S. 491, 501, 95 S.Ct. 1813, 1820, 44 L.Ed.2d 324, 43 U.S.L.W. 4635, 4638 (1975).
It should be noted that the Speech or Debate Clause is the federal embodiment of the common law immunity that is accorded legislators; the common law immunity is applicable to state legislators and is specifically enumerated in most state constitutions. *See Tenney v. Brandhove,* 341 U.S. 367, 372–75, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

**34.** 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

**35.** *Id.* at 617–18, 92 S.Ct. 2614.

**36.** 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

**37.** *Id.* at 525, 92 S.Ct. 2531.

**38.** 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

**39.** 408 U.S. at 616, 92 S.Ct. 2614.

**40.** In the instant case, then, the activities of defendants Adlerman, O'Donnell, and Brick must be evaluated as if Senator McClellan himself had played their parts. If he would be immune from both inquiry and liability they are similarly immune. (No distinction is drawn here between "official immunity," as that term is applied to executive and judicial employees, and immunity under the Speech or Debate Clause. In this situation, their reach is coextensive. *See Doe v. McMillan,* 412 U.S. 306, 324, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).)

tion as to whether the Clause protects equally against private civil actions as well as criminal prosecutions was laid to rest recently in *Servicemen's Fund*,[41] where the Court emphasized that both types of proceedings could be used "to delay and disrupt the legislative function. . . . We reaffirm that once it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference."[42]

 The Speech or Debate Clause, then, provides protection to Members of Congress and their aides who are engaged in the process of legislating. It is a functional immunity, extended whether or not their acts are in fact motivated by the desire to forward Congress' business. The critical analytical question posed in the cases outlined above is how expansive a definition to give the "legislative sphere." All four decisions are clear that Members of Congress are completely immunized from inquiry into their acts of speaking and voting during committee and House proceedings.[43] A Senator may maliciously libel a private citizen on the floor of the Senate for purely personal reasons; nevertheless, his speech will be protected.

 Further, under *Doe v. McMillan*, the acts of authorizing a Congressional investigation pursuant to which sensitive materials involving named individuals are gathered, holding hearings where the materials are presented, preparing a report where they are reproduced, and authorizing the publication and distribution of the report, all are fully protected by the Speech or Debate Clause.[44] Even though their identification could have proven highly damaging to the children

involved, and the inclusion of their names in the committee's report might not have appeared "even remotely useful" to the legislative purpose of the committee's investigation,[45] the activity of the committee members and their employees in *Doe* was of a kind generally engaged in by legislators and essential to the legislative function. It followed, therefore, that regardless of the Court's ability to conceive a rational purpose for procuring and circulating within Congress the identities of those children, under the Speech or Debate Clause this activity was fully protected.

The recent *Serviceman's Fund* decision, following *Doe's* lead, emphasizes even more strongly:

[T]he power to investigate is inherent in the power to make laws because "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *McGrain v. Daugherty*, 273 U.S. 135, 175 [47 S.Ct. 319, 329, 71 L.Ed. 580] (1927). . . . To conclude that the power of inquiry is other than an integral part of the legislative process would be a miserly reading of the Speech or Debate Clause in derogation of the "integrity of the legislative process." *United States v. Brewster*, 408 U.S. 501, 545–546, [92 S.Ct. 2531, 2553–2554, 33 L.Ed.2d 507] (1971); and *United States v. Johnson*, 383 U.S. 169, 172 [86 S.Ct. 749, 751, 15 L.Ed.2d 681] (1966).[46]

The Court determined, in light of the above, that the issuance of a subpoena by a Congressional committee pursuant to an authorized investigation was an activity well within the "legislative

---

41. 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed. 324, 43 U.S.L.W. 4635 (1975).

42. *Id.* at 503, 95 S.Ct. at 1821, 43 U.S.L.W. at 4639.

43. *See also United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), and *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

44. 412 U.S. at 313, 93 S.Ct. 2018. It bears emphasizing that Congressmen, their staff, consultants, and committee investigators alike are equally protected under the Speech or Debate Clause, as applied in *Doe v. McMillan,* for such "legislative acts."

45. *Ibid.*

46. 421 U.S. at 504, 95 S.Ct. at 1822, 43 U.S. L.W. at 4639–40.

sphere" and fully protected by the Speech or Debate Clause. This latest opinion of the Court is in keeping with its earlier decision in *Dombrowski v. Eastland*,[47] where the Court held wholly immunized from inquiry the role played by the Chairman of the Senate Internal Security Subcommittee in issuing and executing a subpoena for materials which had been unlawfully seized from the petitioners therein by Louisiana state authorities.[48]

■ Although the Supreme Court has not expressly articulated the principle, it would appear impossible to subpoena materials relating to an investigation without first obtaining enough information to know to whom, where, and for what the subpoena should be directed. The gathering of such information, whether in preparation for a subpoena, an investigatory hearing, or a legislative report seems an integral part of Congress' investigative function and entitled to the same protection as the use of that information within Congress. The Supreme Court held the complaint in *Doe* barred by the Speech or Debate Clause not only as to the committee members and staff who utilized the sensitive materials in question but also as to the investigator who procured those materials.[49] There was no suggestion that any distinction could, or should, be made for the purpose of immunity between his investigation and their utilization of its product for the purposes of conducting a broad-based legislative inquiry.

■ This does not mean a Member of Congress or Congressional employee is free to use every conceivable means, whether lawful or not, to obtain investigatory materials, without fear of prosecution or civil suit. The Supreme Court in *Gravel v. United States* held a Senator and his aide immune from questioning concerning their investigatory acts in preparation for a subcommittee hearing—except insofar as those acts were criminal or related to third-party crime.[50] Also, *Dombrowski v. Eastland* indicates that the Speech or Debate Clause will not protect a Member or employee of Congress from suit under the Fourth Amendment if he actively engages in an unlawful search and seizure in order to obtain information.[51] As with the charge of taking a bribe involved in *United States v. Brewster*,[52] a burglary (to take one example) can be "no part of the legislative process or function; it is not a legislative act." [53] If Congressional investigators are to take advantage of the immunity afforded by the Speech or Debate Clause, therefore, they must use lawful investigative means to obtain their information.

■ The only other requirement placed upon Congressional investigators (and, for that matter, Members of Congress involved in investigative activity) as a prerequisite to their invocation of Speech or Debate Clause protection is that their investigation be within the jurisdiction of Congress and their particular committee. The Supreme Court early emphasized, however, in the seminal case of *Tenney v. Brandhove*,[54] that the

---

**47.** 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967).

**48.** 387 U.S. at 84, 87 S.Ct. 1425. It should be noted here that *Dombrowski* contains language which appears to support a distinction between the degree of Speech or Debate Clause protection afforded Congressmen, on the one hand, and their aides, on the other. 387 U.S. at 85, 87 S.Ct. 1425. *See also Tenney v. Brandhove*, 341 U.S. 367, 378, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). The Supreme Court in *Gravel*, however, made clear that no such distinction had ever been made part of a holding by the Court, and expressly disapproved this

differentiation. 408 U.S. at 620–22, 92 S.Ct. 2614.

**49.** 412 U.S. at 312, 93 S.Ct. 2018.

**50.** 408 U.S. at 628–29, 92 S.Ct. 2614.

**51.** 387 U.S. at 84–85, 87 S.Ct. 1425.

**52.** 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972).

**53.** *Id.* at 526, 92 S.Ct. at 2544.

**54.** 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

**1038**

prerogative of the judiciary to determine this question was extremely limited.

> The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive.[55]

Thus, it matters not that the true purpose behind a committee's use of its investigative power is to ridicule, harass, or punish a private citizen.[56] So long as the particular investigative activity does not trench upon Executive or judicial prerogatives—so long as it remains facially legislative in character—the committee, and its employees, are protected.

 Most recently, the Supreme Court in the *Servicemen's Fund* case reiterated, and further elucidated, this principle. The Court observed first:

> Although the power to investigate is necessarily broad it is not unlimited. Its boundaries are defined by its source. *Watkins v. United States,* 354 U.S. 178, 197 [77 S.Ct. 1173, 1184, 1 L.Ed.2d 1273] (1957). Thus, "the scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States,* 360 U.S. 109, 111 [79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115] (1959); *Sinclair v. United States,* 279 U.S. 263, 291–292 [49 S.Ct. 268, 271, 73 L.Ed. 692] (1929). We have made it clear, however, that Congress

is not invested with a " 'general' power to inquire into private affairs." *McGrain v. Daugherty,* 273 U.S. [135], at 173 [47 S.Ct. 319, at 328]. The subject of any inquiry must be one "on which legislation could be had." *Id.,* at 177 [47 S.Ct. 319, at 330].[57]

Following this principle, the Court determined that the particular subcommittee investigation at issue in that case concerned a subject "on which legislation could be had" by virtue of the broad grant of investigative authority the subcommittee had received under a specific Senate resolution.[58] The Court then turned to the question of the propriety, under the subcommittee's grant of authority, of making the Servicemen's Fund a subject of investigation and subpoena. After emphasizing the narrowness of this question, the Court concluded:

> Inquiry into the sources of funds used to carry on activities suspected by a Subcommittee of Congress to have a potential for undermining the morale of the armed forces is within the legitimate legislative sphere. . . . [I]n light of the Senate authorization to the Subcommittee to investigate "infiltration by persons who are or may be under the control of foreign governments," . . . it is clear that the subpoena to discover USSF's bank records "may fairly be deemed within [the Subcommittee's] province." *Tenney v. Brandhove, supra.*[59]

Thus, even though the subcommittee's actual purpose may have been to harass the Servicemen's Fund and its contributors for their political beliefs, so long as

---

**55.** *Id.* at 378, 71 S.Ct. at 789.

**56.** Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate re-

liance for discouraging or correcting such abuses.

*Id.* at 377–78, 71 S.Ct. at 789 (footnote omitted).

**57.** 421 U.S. at 504, 95 S.Ct. at 1822, 43 U.S. L.W. at 4639 n. 15.

**58.** *Id.* at 506, 95 S.Ct. 1813, 43 U.S.L.W. at 4640.

**59.** *Ibid.*

it appeared possible that contacts with foreign governments might be uncovered in the Fund's bank records, the Court would not—indeed, could not—countenance judicial interference with the subcommittee's investigation.[60]

At first blush, there may appear to be a dichotomy between the position taken by the Supreme Court in *Tenney v. Brandhove* and the *Servicemen's Fund* case and that adopted in *Doe v. McMillan.* In *Doe* the Court refused to question whether any rational legislative purpose could be served by procuring and utilizing within Congress the identities of school children about whom derogatory reports had been written. There was no question in that case, however, that the subcommittee had a facially legitimate purpose in directing its investigation toward the problems, including the particular suspension and disciplinary problems, of the public school system of the District of Columbia. It seems clear that this is all that *Tenney* and *Servicemen's Fund* require.[61] It would appear impossible for the courts to make detailed assessments of the propriety of each individual item of information obtained from a particular source by Congressional investigators, or revealed at a Congressional hearing, without engaging in exactly the kind of inquiry into motives that the Speech or Debate Clause was intended to foreclose.

We will examine the relevance of this question to the investigatory activity involved in the instant case in Subpart B. First, however, it is necessary to note an

area where Congressmen and their staff are active—*viz.,* the dissemination of information obtained pursuant to a Congressional investigation—which the Supreme Court nevertheless has held outside the "legislative sphere" and, therefore, unprotected by the Speech or Debate Clause.

The Supreme Court made clear in *Doe v. McMillan* that the decision of a Congressional committee to include in its report information about individual citizens which might prove highly damaging to their reputations and careers was a protected "legislative act," even if such information was not "even remotely useful" to the committee's investigation.[62] That report could be "distributed to and used for legislative purposes by Members of Congress, congressional committees, and institutional or individual legislative functionaries" without losing its immunity.[63] The Court stressed, however, that the protection of the Speech or Debate Clause could *not* be invoked by Government authorities who published and distributed that report outside legislative channels. Whether acting with authorization from Congress or not, those who disseminated otherwise actionable material to the public at large would be required to "respond to private suits to the extent that others must respond in light of the Constitution and applicable laws."[64]

■ Emphasizing that not everything a Member of Congress might regularly do is a "legislative act," the Court observed:

**60.** The foregoing synopsis of the case law surrounding the Speech or Debate Clause reveals only one significant difference between its application to such legislative functions as speaking or voting on the floor of a chamber or in a committee session and its application to such investigatory legislative functions as preliminary information gathering and exercises of the subpoena power. Speaking and voting in Congress are per se protected legislative acts. For the purposes of the Speech or Debate Clause, there can never be any question whether a particular speech or vote is within Congress' jurisdiction. Congressional investigative activities—*e. g.,* holding hearings, issuing subpoenas, sending investigators into the

field to gather information—on the other hand, may lose their protected status if no conceivable legislative purpose can be found for those activities in a particular case. Because this "jurisdictional" exception runs directly against the grain of Speech or Debate Clause immunity, it is very narrowly construed, and has never been found applicable by the Supreme Court.

**61.** *Cf. Gravel v. United States,* 408 U.S. 606, 610 n.6, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

**62.** 412 U.S. at 313, 93 S.Ct. 2018.

**63.** *Id.* at 312, 93 S.Ct. at 2024.

**64.** *Id.* at 316, 93 S.Ct. at 2026.

Members of Congress may frequently be in touch with and seek to influence the Executive Branch of Government, but this conduct "though generally done, is not protected legislative activity." [Cite] Nor does the Speech or Debate Clause protect a private republication of documents introduced and made public at a committee hearing, although the hearing was unquestionably part of the legislative process. *Gravel v. United States, supra.*[65]

In sum, even if Congress' use of material injurious to private reputation is protected for the purpose of issuing subpoenas, writing reports, and deliberating on legislation, the immunity afforded by the Speech or Debate Clause ceases if that material is disseminated either to the Executive or to the public at large.

### B. *Application of Law to Facts*

■■■ The preceding outline of the case law surrounding the Speech or Debate Clause makes clear that, as a general rule, the process of gathering and utilizing information within Congress is protected activity within the "legislative sphere." Constitutional immunity may be withdrawn, however, if no rational legislative purpose can be found for a committee's action in directing its investigation toward a particular individual, organization, or institution. Also, the Speech or Debate Clause will not shield an employee or Member of Congress from prosecution or suit for a crime or Fourth Amendment violation arising from his efforts to obtain information. Finally, the dissemination of information outside of Congress is not a protected legislative act and enjoys no special constitutional immunity.

■■■ The question whether the Subcommittee on Investigations in the instant case was engaged in investigative activity concerning matters "on which legislation could be had" is readily answered. At all times pertinent to the case, the Subcommittee was authorized by Senate Resolution

to make a full and complete study and investigation of violent disturbances of the peace [and] . . . civil and criminal disorder . . ., the commission of crimes in connection therewith, the[ir] immediate and longstanding causes, the extent and effects of such occurrences and crimes[,] and measures necessary for their immediate and long range prevention.[66]

At the time of John Brick's inspection of the McSurely materials, the Subcommittee had embarked on its investigation into riots; a riot had occurred in Nashville, Tennessee, on 8 and 9 April 1967; the Subcommittee suspected the riot was instigated by persons holding positions in national organizations active in political protest; the McSurelys attended a meeting of the Southern Conference Educational Fund in Nashville immediately before the April 1967 riot; and Commonwealth Attorney Ratliff advised Brick prior to Brick's examination of the seized material that it contained references to that meeting. Certainly, there is no question, in view of the breadth of Congress' investigatory power and of its mandate to the Subcommittee, that the Subcommittee had jurisdiction to send Brick to Pikeville to examine the materials in Ratliff's possession.

Moreover, Brick clearly enjoyed the prerogative—so long as he did not obtain the documents by unlawful means—to bring to Washington copies of all materials which might prove useful to the Subcommittee's investigation. The primary dispute in this case, focused upon by our colleague's partial dissent, arises from Brick's testimony at the McSurely contempt trial that not all of the batch of 234 documents he received from Ratliff—in the selection of which Brick had played no part—were necessary to the

---

**65.** *Id.* at 313–14, 93 S.Ct. at 2025.

**66.** S.Res. 150, 90th Cong., 1st Sess. (11 August 1967); S.Res. 216, 90th Cong., 2d Sess. (15 March 1968); S.Res. 26, 91st Cong., 1st Sess. (17 February 1969).

investigation.[67] Nevertheless, rather than attempt a document-by-document determination of which items might or might not be relevant, he carried all the papers to Washington for the Subcommittee's inspection. *The question posed here is whether it was incumbent on Brick either to separate out those papers which were clearly not required for the investigation or forfeit his protection (and, possibly, the protection of the other defendants) under the Speech or Debate Clause.*

■ We do not believe a Congressional committee's investigatory jurisdiction can turn on this kind of detailed assessment of the relevancy of particular items garnered by employees or Members of Congress pursuant to a facially valid inquiry. The Supreme Court in a similar situation in *Doe v. McMillan* found "no authority to oversee the judgment of the Committee . . . or to impose liability on its members if we disagree with their legislative judgment." [68] It would appear that the jurisdictional requirements of the Speech or Debate Clause are met here, as in *Doe,* if a rational legislative purpose is present for investigating a particular person, organization, or institution. There is no requirement that every piece of information gathered in such an investigation be justified before the judiciary. Certainly, *Tenney v. Brandhove* and the *Servicemen's Fund* case do not go so far. Indeed, we submit that it is precisely this kind of entanglement in legislative judgments that the Supreme Court in *Doe* properly sought to avoid. In view of the intrinsically functional nature of the immunity afforded the investigative process by the Speech or Debate Clause, and the Clause's basic purpose of preventing the probing of legislative motive, we are convinced that the line must be drawn here.[69]

**67.** R. 726–39. The *only* such document specified by the McSurelys in their contempt trial or in the instant case is a letter—characterized by the McSurelys as a "love letter"—to Mrs. McSurely. Despite the dissent's reference to "letter*s*," "paper*s*," "material," "document*s*," only one letter, addressed to "Dearest Cucumber" from Drew Pearson, has ever raised an issue here. (That among the 234 items were "some personal letter*s*" creates no presumption that these were irrelevant to the committee's inquiry merely because they were "personal," nor has it been so argued; the argument has been about the one specific letter.) At oral argument before this court, counsel for the McSurelys revealed that this letter, upon whose character they stake so much, was destroyed by Mrs. McSurely (along with the copy Brick had taken to Washington) upon its return to her.

A great deal of the argument of the McSurelys, as well as the position of our dissenting colleague, rests upon this one so-called "love letter." Rarely has a single document—which we discovered to be now nonexistent—been mentioned so often in brief and oral argument. Yet the characterization of it as a "love letter" rests solely upon the assertion of Mrs. McSurely through her counsel; the writer is dead, Brick is dead, and according to the affidavits and Brick's testimony the only two living people to have seen it besides Mrs. McSurely are Senator McClellan and Commonwealth Attorney Ratliff.

While the letter may have been as terribly embarrassing as Mrs. McSurely now asserts, it is perhaps not unchivalrous to point out that it was Mrs. McSurely herself who kept the letter around the house where it might have been seen by any prying eye, it is now certain that since she destroyed it, it will never be admitted into evidence, and it is also clear that the world would never have heard of this letter had it not been for the lengthy discussion of it by Mrs. McSurely's own counsel at various stages of this lawsuit. Perhaps the lady—like the dissent—protests too much.

**68.** 412 U.S. at 313, 93 S.Ct. at 2025.

**69.** Judge Leventhal, in his partial dissent, nevertheless takes the position that reviewing the relevancy of each of the documents taken by Brick to Washington would involve no second-guessing of legislative judgment. If there was no arguable basis for finding a document relevant, its retention and use by Brick or the Subcommittee would simply be "nonlegislative." If this were the case, however, surely the names of school children attached to disciplinary reports circulated throughout Congress as examples of the problems faced by big city schools would be facially "nonlegislative." Yet the Supreme Court in *Doe* declined, and we think properly, to even consider the question of relevancy. So long as an investigation of the disciplinary problems faced by the D.C. public schools was within the committee's jurisdiction, the information obtain-

■ In view of the facial legitimacy of the Subcommittee's investigation into the McSurelys' activities, we are barred from questioning the defendants' motives or the use they made within Congress of the information and copies of documents Brick brought back from Pikeville. If it can be shown that one or more of the defendants actually collaborated with Ratliff in the raid on the McSurelys' home, that might support a cause of action; but a suit seeking damages for the protected Congressional activity of the defendants in receiving and examining the copies of the 234 documents in Washington, issuing the subpoenas in question and securing contempt citations against the McSurelys rests on a different ground altogether. As to those portions of the plaintiffs' complaint challenging these privileged acts, therefore, defendants are entitled to summary judgment as a matter of law.[70]

We noted earlier that immunity from inquiry or liability under the Speech or Debate Clause would not extend to a search and seizure perpetrated by a Member of Congress or his aide or agent in violation of the Fourth Amendment. Plaintiffs here do not flatly allege that any of the defendants actually took part in the raid of 11 August 1967 on the McSurelys' home. Rather, their amended complaint asserts that "[a]t or about the time of the initial unconstitutional and illegal raids, the defendants . . undertook a plan of action to . . . [c]ontinue the course of action undertaken by defendant Ratliff. . . ." It does not appear that the plaintiffs are charging the defendants with collaboration—except perhaps on a *post facto* attribution theory—in the raid itself; nevertheless, the defendants have so

read the complaint.[71] We leave for the District Court on remand clarification of this question.

■ Plaintiffs' clearer argument is that Brick's examination of the illegally seized materials in Ratliff's possession was itself independently violative of the Fourth Amendment, and, therefore, not entitled to Speech or Debate Clause protection. Plaintiffs find support for their argument in language in this court's earlier opinion in *United States v. McSurely*.[72] We will discuss this question at some length in Part V below. Suffice it to say here that we conclude, under the authority of the Supreme Court's recent decision in *United States v. Calandra*,[73] that the Fourth Amendment injury suffered by the plaintiffs in this case was fully accomplished by the initial unlawful search and seizure. Brick committed no constitutional violation—indeed, no illegal act at all—in examining the materials in Pikeville.

■ The question which remains to be determined is whether Speech or Debate Clause protection extends to the defendants' alleged acts of distributing *outside* the Subcommittee the 234 copies of documents brought by Brick from Pikeville to Washington. It should be noted that the defendants hotly contest that these copies were ever shown to anyone, inside or outside the Subcommittee. The short answer to the legal question posed by the complaint, however, is that, under *Doe v. McMillan*, as long as the copies were disseminated only to Members of Congress or their staff, the defendants enjoy absolute immunity from inquiry.[74] This conclusion is not affected by the fact that some of the documents may have been injurious to the privacy interests of the plaintiffs

---

ed—however derogatory or irrelevant—was within the "legislative sphere."

70. *See United States v. Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *Hearst v. Black*, 66 U.S. App.D.C. 313, 87 F.2d 68 (1936).

71. Def.Br. at 22–23.

72. 154 U.S.App.D.C. 141, 155, 473 F.2d 1178, 1192 (1972).

73. 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

74. 412 U.S. at 312, 93 S.Ct. 2018.

and "not even remotely useful" to the Subcommittee's investigation.

■ At the same time, also under the authority of *McMillan* and *Gravel*, if the documents were shown to individuals outside of Congress—or even apparently to an agency of the Executive—such distribution is not entitled to Speech or Debate Clause protection.[75] It does not constitute "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings" with respect to matters before the House.[76] Thus, if in fact the copies of documents in the possession of the Subcommittee may have been made available to the Internal Revenue Service, as the plaintiffs allege, the defendants cannot evade questioning about the transaction. This does not mean, however, as will be discussed in Part V, that such a transfer would necessarily be unlawful. It simply means that the defendants cannot interpose the Speech or Debate Clause as a defense to a private suit arising out of such activity.

## V. *The Application of United States v. Calandra*

■ All parties in this case are agreed that the raid of 11 August 1967 on the McSurelys' home constituted an unlawful search and seizure in violation of the Fourth Amendment.[77] The Fourth Amendment applies to Congressional committees.[78] If the defendants collaborated with Ratliff in that raid,

they will be liable in damages to the same extent as the Commonwealth Attorney. The defendants may not invoke the Speech or Debate Clause in this situation to immunize them from suit.

The plaintiffs, however, go a step further. They argue that the conduct of the defendants in inspecting the materials after they were unlawfully seized from the McSurelys and basing subpoenas thereon was itself an independent violation of the Fourth Amendment. As authority for the proposition that Brick's examination of the documents in Ratliff's possession was independently violative of the McSurelys' constitutional rights, the plaintiffs cite a statement to that effect in this court's decision in *United States v. McSurely.*[79] Although it seems clear that the majority in *McSurely* considered that Brick had committed an independent Fourth Amendment violation, it is not certain to what extent their view was premised on the assumption that because the original search by Ratliff was illegal, any attempt by the Subcommittee to use the fruits of that search in its investigation must be equally illegal. Certainly, under the majority's theory of the case, a finding that Brick *himself* committed an unlawful search and seizure was not necessary to its holding.[80] In any event, we are of the view that neither the principal rationale of McSurely nor the majority's statements with respect to the constitutionality of Brick's actions can be reconciled with the Supreme Court's recent landmark decision in *United States v.*

**75.** *Id.* at 313, 93 S.Ct. 2018.

**76.** 408 U.S. at 625, 92 S.Ct. at 2627.

**77.** The record does not disclose why the McSurelys have failed to pursue their remedy against the one defendant named in their complaint, Commonwealth Attorney Ratliff, who unquestionably took part in the raid.

**78.** *See Watkins v. United States*, 354 U.S. 178, 188, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1954).

**79.** Not only was the search and seizure of appellants' property by the Commonwealth officials illegal, but the subsequent search and use of that property by the Subcommittee investigator . . . violated appellants'

constitutional right to have their property safe and secure from unwarranted inspections.

154 U.S.App.D.C. 141, 155, 473 F.2d 1178, 1192 (1972).

**80.** If, as the majority reasoned, the exclusionary rule was equally applicable to legislative subpoenas and criminal prosecutions, it followed that the federal subpoenas were invalid as the fruit of an unlawful search and seizure by state authorities regardless whether the federal authorities had committed an independent Fourth Amendment violation. *See Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

*Calandra.*[81] After outlining the rationale of that opinion, we will apply it to the facts of the instant case.

### A. *General Principles*

In *United States v. Calandra* the Supreme Court held that the exclusionary rule did not bar a grand jury from subpoenaing Calandra in order to ask him questions based on evidence illegally seized during a search of his place of business. The Court observed first that grand juries traditionally have had broad investigatory powers.[82] Because they do not finally adjudicate guilt or innocence, they are allowed to operate "unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial."[83] To permit witnesses to invoke the exclusionary rule and insist on suppression hearings might not only halt the orderly process of an investigation but also "necessitate extended litigation of issues only tangentially related to the grand jury's primary objective."[84] In sum, the application of the rule would greatly interfere with the discharge of the grand jury's function.

Second, the Court emphasized:

[T]he [exclusionary] rule is a judicially-created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.[85]

Noting the "speculative and undoubtedly minimal advance in the deterrence of police misconduct" which would be achieved by application of the rule in an *investigative* setting, the Court concluded that this impediment to the grand jury's function could not be justified.[86]

Finally, the Court made clear that the grand jury was not empowered itself to violate an individual's constitutional rights,[87] but rejected the argument made in this connection that a grand jury's questions based upon unlawfully seized evidence themselves constituted an *independent* violation of Calandra's Fourth Amendment rights.[88]

The purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects. The wrong condemned is the unjustified governmental invasion of these areas of an individual's life. *That wrong, committed in this case, is fully accomplished by the original search without probable cause. Grand jury questions based on evidence obtained thereby involve no independent governmental invasion of one's person, house, papers, or effects, but rather the usual abridgment of personal privacy common to all grand jury questioning. Questions based on illegally obtained evidence are only a derivative use of the product of a past unlawful search and seizure. They work no new Fourth Amendment wrong.*[89]

The Supreme Court in *Calandra* did not directly address the issue whether an action for personal damages would lie against the members of a grand jury or its agents for utilizing information derived from an unlawful search and seizure. Nevertheless, the Court's reasoning, appears largely to answer the question. In the first place, such an action could not be premised on a violation of the Fourth Amendment, since the Court made clear that the constitutional wrong is fully accomplished by the original un-

---

**81.** 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The court's conclusion in *United States v. McSurely* as to the legality of Brick's inspection is not binding on the defendants here, because they were not parties to that case.

**82.** 414 U.S. at 343, 94 S.Ct. 613.

**83.** *Id.* at 349, 94 S.Ct. at 620.

**84.** *Ibid.*

**85.** *Id.* at 348, 94 S.Ct. at 620.

**86.** *Id.* at 351–52, 94 S.Ct. at 622.

**87.** *Id.* at 346, 94 S.Ct. 613.

**88.** *Id.* at 354, 94 S.Ct. 613.

**89.** *Ibid.*

lawful search. Some other basis would have to be found for the suit, such as a statutory or common law invasion of privacy.

It would appear extremely counterproductive, however, on the one hand to grant a grand jury the right to consider and base questions on materials derived from an unlawful search and, on the other, to expose the members of the grand jury or their agents to personal liability for exercising that right. It is impossible for a prosecutor to determine whether certain materials may or may not be useful in a grand jury investigation without examining them beforehand. So long as such an examination and copying of data is conducted in the good faith belief that the information may be relevant to the grand jury's task, it is implicit in the Court's decision that this activity is within the lawful scope of the prosecutor's duty and, therefore, immune from suit. The only situation in which it would appear that an action for damages might succeed is that where an agent of the grand jury examined and retained or passed on material which he knew to be wholly unrelated to the grand jury's task.

A similar principle would seem to apply to a grand jury's decision to turn information over to another governmental entity for investigation. If, for ex-ample, the grand jury had obtained materials—whether or not originally unlawfully seized—which it determined might contain evidence of income tax evasion, those materials could be forwarded to the Internal Revenue Service for further analysis. Only if the grand jury knew the IRS could derive no legitimate use from the materials would such a distribution be actionable.

### B. *Application of Law to Facts*

The Supreme Court's reasoning in *Calandra* appears directly applicable to the instant case. If anything, a Congressional committee has even broader investigatory powers than a grand jury.[90] The primary purpose of a Congressional hearing is to gather data upon which to base policy determinations which inform the legislative process. Such wide-ranging inquiries are extremely ill-adapted to the "evidentiary and procedural restrictions applicable to a criminal trial."[91] Equally important, not only does a Congressional investigating committee not finally determine guilt or innocence, but it cannot even indict an individual. It is difficult to conceive of a more inappropriate setting for protracted controversy over the legality of the method by which information in the hands of a committee was originally secured.[92]

---

**90.** *See Watkins v. United States*, 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); *Tenney v. Brandhove*, 341 U.S. 367, 377–78, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

**91.** Congress, as even its critics will agree, desperately needs information upon which to act. It has traditionally been given broad powers of investigation with which to meet that need. Unless we are to assume that Congress should remain pristine and naive, much of the data it should consider will inevitably come to its attention in thoroughly unadmirable ways.

. . . . .

Whereas exclusion in the criminal area may reassure citizens in their confidence that their government's executive will be a *law abider*, denial of information to Congress will neither provide meaningful deterrence nor reassure citizens that their government's legislature will be a wordly-wise *lawmaker*. While the courts may refuse to al-

low their criminal processes to become tainted by eating the "fruit of the poisonous tree," it would be folly to forbid Congressional knowledge that bad apples exist and to stymie Congressional action on the basis of all information, good or bad in origin. *United States v. McSurely*, 154 U.S.App.D.C. 141, 163–64, 473 F.2d 1178, 1200–01 (1972) (Wilkey, J., concurring) (footnote omitted). *See Catena v. Seidl*, 66 N.J. 32, 327 A.2d 658 (1974).

**92.** [W]hatever the appropriateness of the exclusionary rule as a remedy in courts of law in a criminal trial, or perhaps in a civil action, the same rationale certainly does not apply in hearings before a Congressional committee. The objectives of a Congressional hearing and a criminal trial are so obviously widely different. The criminal trial is to determine guilt or innocence of an individual subject to specific accusations. The Congressional hearing is for the gather-

Moreover, the incremental deterrent effect on police misconduct which application of the exclusionary rule to Congressional proceedings would achieve is certainly even more negligible than that which would be achieved by its invocation in grand jury proceedings. The extremely remote influence such an extension of the rule could be expected to have on police discipline simply does not justify its obvious informational and litigatory costs.[93]

 In sum, it would appear under *Calandra* that a Congressional committee should enjoy at least the same prerogative as a grand jury to use material which has been unlawfully seized. As with the grand jury, the Congressional committee may not be privileged to utilize such information if its agents have actively participated in the original unlawful seizure. Outside of that circumstance, however, a committee commits no new Fourth Amendment wrong by examining and copying documents originally unlawfully secured.

 Judge Leventhal, in his partial dissent, however, argues that Brick's examination of the McSurely materials after the original unlawful seizure was itself violative of the Fourth Amendment because he knew the materials had been unlawfully seized and because a three-judge federal court had ordered Ratliff to hold the materials in safekeeping. Certainly, after *Calandra*, the fact that Brick knew the documents had come wrongfully into Ratliff's possession could not render his own examination unlawful. That a grand jury knows its information springs from an illegal search does not prevent it from examining the fruits of that search, and basing questions thereon, in the pursuit of a lawful investigation. A Congressional committee, as we detailed above, is entitled to the same prerogative.

 That Ratliff had been ordered to hold the materials in safekeeping also does not render Brick's examination violative of the Fourth Amendment. The three-judge court's order was simply a function of its finding that the materials had been unlawfully seized. There was no implication in the order that investigatory bodies which would otherwise be

---

ing of information, the formulation of broad conclusions, the determination of national policy—all to be embodied subsequently in legislation, if after hearings, deliberation and debate such legislation is thought desirable or needed.

154 U.S.App.D.C. at 161, 473 F.2d at 1198 (footnote omitted).

**93.** Not only are the *objectives* of all Congressional actions so different from those of a criminal trial in court—as different as the constitutionally designed functions of the legislative and judicial branches—but pragmatic evaluation of the *results* to be obtained demonstrates that the exclusionary rule has no application to legislative hearings.

The unwisdom of applying the exclusionary rule to Congress is clear when we examine how well its primary purpose of deterring official misconduct would be served by such an application.[12] Many respected authorities have expressed doubts that law enforcement officials monitor their conduct in response to the consequences flowing from their mode of search in resulting criminal cases. [Footnote omitted] It seems even more doubtful that a remote hypothetical effect on derivative Congressional use of discovered information could possibly figure significantly in these officials' motivations. [Footnote omitted] Will the "cop on the beat," or even the Commonwealth's Attorney in the mountains of Eastern Kentucky involved with the McSurelys here, alter his conduct if the exclusionary rule is applied to Congressional hearings? Enforced legislative ignorance is just too attenuated a form of discipline on the police to justify its obvious costs. [Footnote omitted]

[12] "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guarantee in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960); see also *Terry v. Ohio*, 392 U.S. 1, 12, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

154 U.S.App.D.C. at 162, 473 F.2d at 1199. There is no evidence here of the kind of extensive abuse of its prerogative to examine unlawfully obtained evidence which might justify application of the exclusionary rule to Congress by analogy to the "silver platter" doctrine. *See Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

entitled to utilize unlawfully seized materials were barred from such utilization by the court's formal ruling. This does not mean Brick could have broken into Ratliff's office to obtain access to the materials. Such an entry would have been in violation of *Ratliff's* Fourth Amendment rights. Ratliff himself, however, invited the Subcommittee to come to Pikeville to examine the materials. He alerted the Subcommittee to the fact that the product of his search of the McSurelys' home might be relevant to its investigation.

*Calandra* makes clear that a grand jury or, we submit, a Congressional committee has the right in its investigatory capacity to use the product of a past unlawful search and seizure. The Supreme Court emphasized that such use works no new Fourth Amendment wrong on the owners of the seized property. Since effective utilization of materials requires their examination, it is difficult to conceive, after *Calandra*, how the inspection by one authorized government agent of documents in the custody of another can be characterized as an unconstitutional search. The constitutional violation is completed with the original taking.[94]

*Calandra's* reasoning might not foreclose a common law action for invasion of privacy against an agent of the grand jury who inspects and retains documents he knows are wholly unrelated to the grand jury's task; however, we need not decide that question here. We do decide, as discussed in Part IV, that the protection accorded by the Speech or Debate Clause to legislative investigations immunizes a Congressional investigator from liability for this kind of non-crimi-

nal activity. Thus, the plaintiff's claim that Brick knowingly brought to Washington copies of papers which did not pertain to the Subcommittee's inquiry fails as a matter of law to state a viable cause of action.

■ We are left, then, with the allegation that the defendants may have disseminated some or all of the 234 copies of documents obtained by the Subcommittee to individuals or agencies outside of Congress—particularly the Internal Revenue Service. We noted in Part IV that such dissemination would not be protected by the Speech or Debate Clause. Nevertheless, as with a grand jury, we think a Congressional committee lawfully may forward to appropriate Executive agencies information which it believes relates to their legitimate functions—particularly in a case, such as this, where the agency has itself requested the information.[95] Dissemination to private individuals of unlawfully seized material would not, however, fall within the scope of a committee's authority. Likewise, the distribution to executive agencies of materials a committee knows has no reasonable relationship to the agencies' task might be an actionable invasion of privacy.

## VI. *The Remand*

We hold, as a matter of law, that the defendants are entitled to summary judgment on all counts of the complaint relating to the inspection by Brick of the seized material, the transport by Brick of copies of 234 documents to Washington, the utilization of the information obtained by Brick as the basis for Congressional subpoenas, and the issuance of Contempt of Congress citations against

---

**94.** As support for his view that we ought hold that Brick's examination of the materials in Ratliff's custody was an unlawful search, Judge Leventhal cites language in my concurring opinion in *McSurely* to the effect that Ratliff's consent would not operate to "legalize this 'search.'" He also notes that I never concluded there that Brick's actions were constitutional. The word "search" was in quotes in my opinion, however, because I did *not* consider it such. Nevertheless, the issue of the

proper legal characterization of Brick's acts appeared difficult at the time, and I felt no need to decide it. Today, the Supreme Court's landmark decision in *Calandra* provides solid support for our position that an authorized investigatory body which examines and utilizes the fruit of an unlawful search and seizure—with the cooperation of the custodian—commits no Fourth Amendment violation.

**95.** *See* note 29 *supra*.

the plaintiffs. We leave for the District Court on remand the determination whether the plaintiffs claim the defendants actively collaborated in the original raid on the McSurelys' home and, if so, whether there is sufficient evidence of such collaboration to merit a trial on that issue. Likewise, the question whether the defendants distributed copies of documents in the Subcommittee's possession to individuals or agencies outside Congress and, if made, whether such distribution was actionable, remains to be determined by the District Court in accordance with this opinion. We emphasize that at no point in the proceedings on remand, however, may inquiry be made into those activities of the defendants which we have indicated are protected by the Speech or Debate Clause.

*Reversed and remanded.*

LEVENTHAL, Circuit Judge (concurring in part and dissenting in part):

Judge Wilkey's opinion for the majority contains much that is analytic, reflective and insightful. It has a sweep that carries the reader along with persuasive momentum. Upon reflection, however, I must confess to a gnawing dissatisfaction with some important aspects.

### I.

I do not agree with the majority's conclusion that investigator Brick's alleged actions in knowingly selecting and carrying to Washington materials which were totally unrelated to the Subcommittee's investigation (172 U.S.App.D.C. pp. ——— ———, 521 F.2d pp. 1040–1041) come within the Speech or Debate Clause immunity and thus cannot be questioned by appellees in a court of law. In essence, the majority grants congressional investigators absolute license to examine, transport, and dis-

tribute among members of Congress and their staff any and all personal papers no matter how private the correspondence—here it seems they included a love letter written by a nationally prominent newspaper columnist to Mrs. McSurely—or how clearly irrelevant the papers are to the pending legislative inquiry.

It is only when the actions of legislators (and their aides) fall "within the 'sphere of legitimate legislative activity'" that they are entitled to the protection of the Speech or Debate Clause which prohibits their being "questioned in any other Place."[1] I cannot accept that the knowing selection and circulation of such documents—of a private character, and not even arguably relevant to a legislative inquiry—is within the sphere of legitimate legislative activity safeguarded by the Speech or Debate Clause.[2] In my view, the majority's holding immunizing such activity invites "gratuitous injury to citizens for little if any public purpose."[3] It is at odds with the approach adopted by the Supreme Court in mapping the contours of the Speech or Debate Clause protection.

The majority errs, I believe, by assuming that as long as the inquiry is "within the jurisdiction of Congress and [the] particular committee" (172 U.S. App.D.C. ——, 521 F.2d p. 1037) and therefore "facially legislative in character" (172 U.S.App.D.C. p. ——, 521 F.2d p. 1038), and lawful legislative means are employed, Members of Congress and their aides are immunized by the Speech or Debate Clause from all judicial scrutiny. In Brick's case, given the Subcommittee's broad mandate to investigate civil disorders, which rationally could include the McSurelys' activities relating to the April, 1967 riot in Nashville, Tennessee, the majority holds that Brick's knowing selection and conveyance of

---

1. *See, e.g., Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 1820, 44 L.Ed.2d 324 (1975), and cases cited.

2. *Id.* at 501–503, 95 S.Ct. 1813, 1820–21.

3. *See Doe v. McMillan,* 412 U.S. 306, 316–17, 93 S.Ct. 2018, 2027, 36 L.Ed.2d 912 (1973).

documents of a private character,[4] which was conceded by him to be irrelevant to the Subcommittee's inquiry,[5] is exempt legislative activity, provided he did not himself use illegal means in procuring the material. In the face of Brick's admission that much of the material garnered and transported to Washington was irrelevant and useless to the Subcommittee, the majority nonetheless argues that Brick could "bring to Washington copies of all materials which might prove useful to the Subcommittee's investigation" (172 U.S.App.D.C. p. ——, 521 F.2d p. 1040). The fact that Brick's actions cannot be reconciled with this justification—since he concededly knew that the materials were not relevant to the performance of his duties—is sidestepped by saying that courts may not engage in a "detailed assessment of the relevancy of particular items garnered by employees or Members of Congress pursuant to a facially valid inquiry" (172 U.S.App.D.C. p. ——, 521 F.2d p. 1041).

While I agree that the courts must tread gingerly in this area, lest they hamstring legislative investigations by second-guessing the legislators' judgment regarding the relevancy of the information sought, this case involves congressional access to information that is not arguably relevant, and was not brought to the committee on the premise that it might be relevant. The Speech or Debate Clause prohibits the judiciary from acting as the overseer of congressional investigations, but as the Supreme Court has repeatedly ruled, there are "finite limits" to this barrier to judicial review.[6] Brick's activities, in my opinion, breach those limits.

The majority acknowledges that no "distinction could, or should, be made for the purpose of immunity" between committee staff investigation and the committee members' utilization of the product of investigatory efforts. (172 U.S. App.D.C. p. ——, 521 F.2d p. 1037). Yet, inexplicably, it fashions a broader privilege for preliminary investigations than the Supreme Court, in its most recent pronouncement on the Speech or Debate Clause, found proper in the context of a subcommittee subpoe-

---

**4.** Among the 234 items which Brick carried back to Washington were "some personal letters," as Brick conceded to Government counsel. *See* Transcript of Proceedings, June 25, 1970, at 727–28. Appellees had focused particularly on the fact that one of these was a love letter to plaintiff Margaret McSurely from a prominent columnist (Document No. 201), because Brick's testimony at McSurelys' contempt trial establishes that he not only examined the love letter in Kentucky, took it to Washington, but also singled it out to show to Senator McClellan because it was a letter involving a person prominent nationally. (Tr. 730–31). Appellees allege that Brick "showed these private love letters to various members of the subcommittee staff and others, and made them (and the plaintiffs) an object of ridicule, derision, and ribald comment." Brief for Appellees at 7; *see* Amended and Supplemental Complaint at ¶¶ 18(b), 19, App. 44, 45.

**5.** The transcript of the McSurely contempt trial reveals that Brick "went to Pikeville to examine the documents in the Court House." (Tr. 737). He looked through the documents and determined that there were "many" items that he "didn't need at all." (Tr. 736). The record contains the following exchange between the McSurelys' counsel, Mr. Stavis, and Brick (Tr. 734–35):

Q (Mr. Stavis): Did you tell Mr. Dotson or any of the folk with whom you met there that there was some of that stuff that you didn't think you needed?
A (Brick): Yes.
Q: Did you give it back to them?
A: No.
Q: Did you need that letter signed Dearest Cucumber or addressed, Dearest Cucumber?
Mr. Bress (Government counsel): Objection. Irrelevant.
The Court: He may answer the question.
The Witness: No. Didn't you say signed Dearest Cucumber and when in fact it says addressed to Dearest Cucumber.
Mr. Stavis: No, I didn't.
The Witness: Was the question, did I need that letter?
Mr. Stavis: Yes. For the performance of your duties.
A: No, Sir.
Q: As a matter of fact, in respect to the performance of your duties, you didn't need most of the items in that list, did you?
A: Some of them.

**6.** *Doe v. McMillan,* 412 U.S. at 317, 93 S.Ct. 2018.

na. In *Eastland v. United States Serv-icemen's Fund,* the Court faced "the question . . . whether the actions of the petitioners [in issuing the subpoena] fall within the 'sphere of legislative activity.' "[7] It cautioned that, since "Congress is not invested with a ' "general" power to inquire into private affairs,' " "[t]he subject of any inquiry always must be one 'on which legislation could be had.' "[8] In addition, it noted that the courts are empowered to determine whether "a committee's inquiry may fairly be deemed within its province."[9] Only if these basic standards are satisfied will the Speech or Debate Clause immunize the issuance of a subpoena.

Here the investigation of the McSurelys' activities relating to the 1967 Nashville riot "may fairly be deemed within [the] province" of the legislative subcommittee authorized by Senate Resolution to "make a full and complete study and investigation of violent disturbances of the peace [and] . . . civil and criminal disorder . . . ."[10] However, it does not follow that everything done by investigator Brick with respect to the McSurelys was privileged as "essential to legislating."[11] As the Supreme Court indicated in *Gravel v. United States,* for an activity to be "essential to legislating" it "must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House."[12] The fact that Brick seized concededly extraneous material—and it is significant that he seized "some personal letters," including at least one love letter, the one he showed to Senator McClellan—reveals his willingness to disregard privacy even in the absence of any Committee need. That takes this case out of the shield that has been developed for matter arguably within the Committee's province or related to a subject on which legislation can be had. *Eastland* indicates that had the subcommittee knowingly issued a subpoena for such intimate and totally irrelevant correspondence, its actions would not have constituted legitimate legislative activity. And measured against the definition of "legislative acts" set out in *Gravel,* I cannot see how such patently irrelevant material of a private nature can be deemed "an integral part of the deliberative and communicative processes" dealing with matters within the jurisdiction of Congress.

The improper and non-legislative nature of Brick's conduct is indicated by analogy to the authority granted by a search warrant. Where a warrant is issued that describes particular papers, objects and effects that are germane to the

---

**7.** 421 U.S. 491, 501, 95 S.Ct. 1813, 1820, 44 L.Ed.2d 324 (1975).

**8.** *Id.* at 504, 95 S.Ct. at 1822 n.15. The Court found that the power to investigate falls within the definition of legislative acts. However, it qualified that determination, stating that, "[a]lthough the power to investigate is necessarily broad it is not unlimited. Its boundaries are defined by its source." *Id.* The Court cited with approval *Watkins v. United States,* 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). There the Court ruled that "[t]here is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress," and "there is no congressional power to expose for the sake of exposure." *Id.* at 187, 200, 77 S.Ct. at 1179.

**9.** 421 U.S. at 506, 95 S.Ct. at 1823.

**10.** See sources cited at n.66 of the majority opinion.

I assume that the broad investigation was an "adjunct to the legislative process" (as contrasted with inquiry "for the sake of exposure") (see footnote 8), in that it was a subject on which "legislation could be had"; appellees' brief does not argue to the contrary and that issue is not focused for detailed consideration.

**11.** *See Eastland v. United States Servicemen's Fund,* 421 U.S. at 508, 95 S.Ct. 1813, 1824; *Doe v. McMillan,* 412 U.S. at 315, 93 S.Ct. 2018; *Gravel v. United States,* 408 U.S. 606, 621, 92 S.Ct. 2614 (1972).

**12.** 408 U.S. at 625, 92 S.Ct. at 2627.

pending inquiry, any further seizure is clearly actionable. Other material may be inspected only for the limited purpose of determining whether it comes within the matters particularly described and authorized for seizure. Brick's examination exceeded the bounds of a threshold "search" for purposes of determining relevancy. Much like the police officer who in the course of executing a search warrant seizes material which he knows is not authorized by the warrant cannot be deemed to have engaged in a lawful search and seizure, certainly Brick's unauthorized, knowing selection and display of private papers beyond the scope of the subcommittee's inquiry cannot be deemed a legitimate legislative act.

A selective approach to evaluating Brick's conduct which distinguishes between his treatment of arguably relevant and other documents is consistent with and compelled by the pertinent Supreme Court decisions interpreting the Speech or Debate Clause. The majority, on the other hand, speaks of information gathering in the large as if the legitimacy of an inquiry into a particular aspect of a person's activities—here the McSurelys' possible connection with the 1967 Nashville riot—provides carte blanche to pry into any and all private affairs and to carry back and circulate irrelevant but provocative discoveries. This approach treats Brick's conduct with too broad a brush. I am simply at a loss to discern the basis for the majority's conclusion that Brick's retention and distribution of material which he had inspected and deemed unrelated to the performance of his investigatory duties is a legislative act to which the Clause

applies. As Judge Wilkey points out in his discussion of the relationship between the prosecutor and the grand jury (172 U.S.App.D.C. p. ——, 521 F.2d p. 1045), there is a critical distinction between "an examination . . . of data [which] is conducted in the good faith belief that the information may be relevant" and the retention and passing on of material known "to be wholly unrelated" to the particular inquiry. If the material is not arguable relevant, however, any further actions taken by the investigator fall outside the definition of legislative acts set forth by the Supreme Court in *Gravel.*

This is no foundation for the majority's claim (172 U.S.App.D.C. p. ——, 521 F.2d p. 1039) that "[i]t would appear impossible for the courts to make detailed assessments of the propriety of each individual item of information obtained from a particular source by Congressional investigators . . . without engaging in exactly the kind of inquiry into motives that the Speech or Debate Clause was intended to foreclose." The relevant threshold inquiry in assessing Brick's conduct is the limited and proper one approved in *Eastland* —may the material fairly be deemed within the committee's province.[13] No probing of motive or second-guessing of legislative judgment is involved. If the material is arguably relevant to a proper committee investigation, the information gathering is privileged even if prompted by malice.[14] However, once private material was examined by Brick and there was no arguable basis for appraising them as relevant, his further actions in retaining and transporting them were nonlegislative.[15] Questioning concerning

13. 421 U.S. at 506, 95 S.Ct. 1813, 1823, *quoting Tenney v. Brandhove,* 341 U.S. 367, 378, 71 S.Ct. 783, 95 L.Ed. 1019 (1950).

14. *See Eastland v. United States Servicemen's Fund,* 421 U.S. at 508–509, 95 S.Ct. 1813, 1824; *United States v. Brewster,* 408 U.S. 501, 525, 92 S.Ct. 2531 (1972); *Tenney v. Brandhove,* 341 U.S. at 377, 71 S.Ct. 783.

15. The investigator does not probe at his peril for "the legitimacy of a congressional inquiry" is not "defined by what it produces." *East-*

*land v. United States Servicemen's Fund,* 421 U.S. at 509, 95 S.Ct. at 1824. But once the material is found to be devoid of any conceivable legislative interest, further display or distribution can serve no legitimate legislative function and can have "no relation to the business before" Congress. Knowing retention and circulation of papers that are highly private, embarrassing and irrelevant are not legitimate legislative activity.

those particular improper acts and the basis for undertaking them would no more destroy the privilege than similar inquiries related to potentially *proper* acts of the committee and its staff in distributing relevant material to executive agencies,[16] acts of distribution which the majority agrees (172 U.S.App.D.C. pp. — — —, 521 F.2d pp. 1042–1043) are not entitled to the protection of the Speech or Debate Clause.

In my view, Brick's knowing selection and transmission of private documents that are highly embarrassing and plainly unrelated to the legislative inquiry were not "essential to legislating" and thus are outside the Speech or Debate Clause immunity. I am confirmed in this position by the distinction between this case and the Supreme Court's ruling in *Doe v. McMillan,* which the majority relies upon extensively for support. In *Doe,* the Court cautioned that it had "no authority to oversee the judgment of the Committee . . . or to impose liability on its Members if we disagree with their legislative judgment." [17] The Court there declined to second-guess a committee's decision to include names of specific children and descriptions of their conduct in the record of its hearings on the public school system of the District of Columbia and in a committee report. "The report stated that these materials were included to 'give a realistic view' of a troubled school and 'the lack of administrative efforts to rectify the multitudinous problems there.'" [18] Since the accounts of the students' conduct questioned by the plaintiffs in *Doe* were broadly related to the subject matter of the committee's inquiry, the Court properly declined to enmesh itself in reviewing the usefulness or necessity of the degree and type of details included in the illustrative material assembled by the committee.

In contrast to the *Doe* plaintiffs, the McSurelys make no claim that names or descriptions of *arguably* extraneous activities should have been deleted by Brick or the subcommittee from documents pertinent to the Nashville disturbances. Rather they claim that material dealing with intimate subjects completely foreign to the committee's inquiry were taken back to Washington and displayed by Brick. Where, as here, the items in question are *plainly* and *unmistakably unrelated* to the congressional inquiry, no questioning of legislative judgment is necessary to determine that the boundaries of the power to investigate have been exceeded.[19]

The typical case will in all likelihood involve examination of items of arguable relevancy, where the court should stay its hand. But where, as here, investigative activity falls clearly outside the proper concerns of the legislature, it is our responsibility to give meaning to the "finite limits" of the Speech or Debate Clause by refusing to stretch its protective umbrella to this action of this investigator.

## II.

The majority puts it that in view of *Calandra v. United States,*[20] there is no sustainable claim of violation of the Fourth Amendment by agents of the Committee, since such a violation had been consummated by the unlawful search and seizure of the McSurelys' home by the state authorities.

It merits careful study whether and to what extent *Calandra* has application outside the functioning of the grand

---

16. *See Doe v. McMillan,* 412 U.S. at 316–17, 93 S.Ct. 2018; *Gravel v. United States,* 408 U.S. at 626–27, 92 S.Ct. 2614; *United States v. Johnson,* 383 U.S. 169, 172, 86 S.Ct. 749 (1966).

17. 412 U.S. at 313, 93 S.Ct. at 2025.

18. *Id.* at 308–09, 93 S.Ct. at 2022.

19. *Cf. Eastland v. United States Servicemen's Fund,* 421 U.S. at 504–507, 95 S.Ct. 1813, 1822–23 & n.15.

20. 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

jury. In a grand jury, evidence is kept in confidence throughout, and there is reality to the conception that a grand jury's questioning is not an additional invasion of privacy. The general premise of legislative investigations, on the other hand, is ultimate exposure to the legislature and public of the material deemed most significant to the legislative functioning,[21] with room for confidentiality and executive sessions in preliminary examination and screening. Moreover, as the Court in *Calandra* pointed out, in the grand jury context "[t]he incentive to disregard the requirement of the Fourth Amendment solely to obtain an indictment from a grand jury is substantially negated by the inadmissibility of the illegally seized evidence in a subsequent criminal prosecution of the search victim." 414 U.S. at 351, 94 S.Ct. at 621. With respect to legislative investigations, by contrast, there is no comparable feature to negate incentive to disregard the burden and restrictions of Fourth Amendment requirements.

Assuming *Calandra* can be fully extended to congressional investigations, the majority, I fear, errs in distinguishing rigidly between a completed, albeit unconstitutional, search, and any subsequent use of the materials gained thereby. Suppose material has been constitutionally seized by state authorities. There could still be a subsequent unconstitutional taking from the state custody by federal agents, if they seize without consent, warrant, or probable cause. Even if the state authorities consent, there may still be problems—certainly if the federal authorities arranged the transfer in advance, prior to the state raid, and perhaps even if the awareness of an available "fence" contributed to an unlawful taking. These are not unlike problems pondered under the "silver platter" doctrine, when federal agents hobbled by the exclusionary rule would arrange for the use of their illegally acquired evidence by state agents and state proceedings.[22]

Moving from the abstract to the particular case, however, we have a situation here which plainly does raise serious Fourth Amendment questions, and questions of a kind which are by no means even addressed, much less disposed of, by *Calandra.*

I am concerned that the majority skirts a key question and distorts the decision of this court in the prior case of *McSurely v. United States,* 154 U.S.App. D.C. 141, 473 F.2d 1178 (1972) (*McSurely I*). The majority argues that although this court in *McSurely I* found Brick's examination of the documents independently violative of the Constitution, it may be read to have done so on the ground that those documents were the "forbidden fruits" of Ratliff's initial unlawful search (172 U.S.App.D.C. p. ——, 521 F.2d p. 1043).

What the prior *McSurely* opinion says to me, however, is something quite different—that Brick's examination of the materials was an unconstitutional search and seizure because he knew that a three-judge federal district court had found that the materials were illegally seized, and had ordered Ratliff to hold the materials in *safekeeping,* and yet, without obtaining permission from either the court or the McSurelys, Brick examined them in the Court House and sent copies back to Washington. *See* 154 U.S. App.D.C. at 145–46, 154–55, 473 F.2d at 1182–83, 1191–92.[23] The court stated

**21.** It should be noted in this regard that the majority would approve distribution to executive agencies of material relevant to executive functions (172 U.S.App.D.C. p. ——, 521 F.2d p. 1047), and *Doe v. McMillan, supra,* 412 U.S. at 317, 93 S.Ct. 2018, permits the public and press to inspect documents internally distributed within Congress, and presumably publish what they find.

**22.** *Compare Rea v. United States,* 350 U.S. 214, 217, 76 S.Ct. 292, 100 L.Ed. 233 (1956).

**23.** The majority in this case argues that "[t]here was no implication in the [three-judge court's protective] order that investigatory bodies which would otherwise be entitled to utilize unlawfully seized materials were barred from such utilization by the court's formal rul-

that "the conclusion is inescapable that the subpoenas issued by the Subcommittee for the production of the McSurely documents were the product of the *unauthorized* inspection and search of the documents by an agent of the Subcommittee itself." *Id.* at 154, 473 F.2d at 1191 (emphasis added). Similarly, on the next page this court described the activity "as an unlawful encroachment by the Subcommittee investigator himself upon the rights of the McSurelys under the Fourth Amendment." These statements, and two later statements,[24] make clear to me that the court was saying that since Brick had neither a warrant, subpoena, nor consent of the three-judge court or the McSurelys, and Ratliff had no authority to consent to Brick's examination, Brick committed an independent violation of the Fourth Amendment.[25]

Had Brick broken into Ratliff's office without a warrant, there would plainly have been an independent Fourth Amendment violation. Why is not the same principle applicable where, as here, Brick knew that Ratliff was under a court decision to hold fast, for safekeeping, papers that had been illegally seized and nonetheless went through a door unlocked by Ratliff's aide to examine the materials in the courthouse. The only distinction between an unconstitutional break-in and Brick's challenged conduct is Ratliff's consent and assistance.[26]

---

ing" (172 U.S.App.D.C. pp. ————, 521 F.2d pp. 1046–1047).

The majority's reading of the protective order would defeat the very purpose for which it was issued. This is evident from the factual context underlying the court's order—arrests and seizures of books and other ideational matter pursuant to a statute proscribing mere advocacy of ideas as sedition, prosecutions instituted to stop organizing activities in the county by the McSurelys and their supporters, and official calls to halt federal funding for those activities. *See McSurely v. Ratliff*, 282 F.Supp. 848, 851–53 (E.D.Ky.1967). It strains credulity that a court's "safekeeping" directive regarding illegally seized books, posters and pamphlets issued in the face of a systematic official effort to freeze, let alone chill, the exercise of First Amendment rights, *id.* at 852–53, can be read to have authorized disclosure of the impounded materials without either the court's or the McSurelys' permission.

24. The court was careful to make clear its conclusion that Brick's examination constituted an independent constitutional violation. It stated:

Not only was the search and seizure of appellants' property by the Commonwealth officials illegal, but the subsequent search and use of that property by the Subcommittee investigator, with the cooperation of the Commonwealth attorney, violated appellants' constitutional right to have their property safe and secure from unwarranted inspections.

And it found that "the framing by the Subcommittee of the subpoenas relied upon here for conviction of the McSurelys was based upon information derived from unconstitutional searches, both by state officials and by the Subcommittee's investigator." 154 U.S.App. D.C. at 155, 473 F.2d at 1192.

25. While in the present case Judge Wilkey says that the ruling in the prior panel opinion that there was an unconstitutional search by the subcommittee's investigator was only dictum, that is simply not the thrust of the prior opinion. On the contrary, the dictum in *McSurely I* was the court's discussion of the applicability of the exclusionary rule to congressional investigations, 154 U.S.App.D.C. at 155–57, 473 F.2d at 1192–93, which was inserted merely to counter the trial court's position, rather than being essential to the appellate holding. Moreover, Judge Wilkey's discussion of Brick's conduct in part II(B) of his concurrence, 154 U.S.App. at 164–65, 473 F.2d at 1201–02, belies his current characterization of the majority ruling as dictum. After consideration of the issue he concluded: "Rather than wander into the thicket of overfine and troubling distinctions generated by a theory of the case based on Mr. Brick's role, I would prefer to rest the decision here on a ground less likely to produce a remand in this case and less open to dangerous extrapolation in others." *Id.* at 165, 473 F.2d at 1202. The clear impression left by Judge Wilkey's concurrence is that the majority did rest, at least in part, "on Mr. Brick's role" but that Judge Wilkey preferred to reverse the conviction on "[t]he sounder ground" of the lack of pertinency of some of the subpoenaed material "to the valid subject of the legislative inquiry." *Id.* at 166, 473 F.2d at 1203.

26. The majority writes: "Ratliff himself, however, invited the Subcommittee to come to Pikeville to examine the materials. He alerted the Subcommittee to the fact that the product

But, as Judge Wilkey noted in his concurrence in the prior *McSurely* case, Ratliff's consent cannot operate to validate Brick's search:

It would not appear that the custodian's consent should operate to legalize this "search." Ratliff was directed by the court to hold the papers "in safe keeping" pending appeal. D.A. Vol. II, p. 962. Since the original seizure had been declared illegal, the natural inference would be that he was holding them *for the benefit of the McSurelys,* subject to reversal on appeal. They, of course, were never notified or given a chance to voice their strong objections to the "search." See Note, Third Party Consent to Search and Seizure, 33 U. of Chicago L.Rev. 797, 812 (1966), for the argument that actual authority to consent is necessary to validate a warrantless search. See also *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), which implies, *inter alia,* that the good faith belief of the official searcher that he has obtained valid consent does not validate his act.

154 U.S.App.D.C. at 164 n.23, 473 F.2d at 1201 n.23.

The majority's assertion (172 U.S.App. D.C. p. ——, 521 F.2d p. 1047) that *Calandra* permits a government agent to inspect documents "in the custody of another [government agent]" speaks too broadly, if it is taken to include possession by a government agent not in his capacity as a government agent but as a trustee for the benefit of others and their right of privacy.

The seriousness of this situation is not mitigated by the possibility that the three-judge federal court might have deemed it appropriate to honor a request from the subcommittee to permit its investigator to examine pertinent papers. Indeed, that only accentuates the gravity of the situation. Instead of acting lawlessly, the subcommittee's staff should have used proper process which in turn would have permitted the court, if it granted the request, or the McSurelys, if their permission had been sought, to safeguard against encroachment, beyond the legitimate legislative sphere, into personal and private papers that lacked even an arguable relevance to the legislative inquiry.

Assuming *arguendo* that we must decide the Fourth Amendment question in order to decide the issue of privilege, I do not think that *Calandra* undercuts the validity of this court's prior ruling that there was a Fourth Amendment violation in Brick's searching, without legal foundation, through the materials that the three-judge federal court had sequestered as material that properly belonged to the McSurelys and had been unconstitutionally removed by the state executive officials. I would abide by the prior ruling.

But even if there was no constitutional violation, I think that Brick's action was not merely "improper" but so contemptuous of lawful writ as to be beyond the pale of what is rendered immune from judicial inquiry, in an action for damages, because it is within the general scope of "legitimate legislative activity" or "essential to lawmaking."

### III.

Moving from Brick to the other defendants, plaintiffs have alleged that they were acting in concert with Brick in the actions that are pertinent. If that is so, the other defendants would not have a constitutional privilege or immunity unavailable to Brick, their agent. Of course, an allegation is not proof. But at this stage of the case I don't think it can be said on the basis of the undisputed facts that the defendants are constitutionally entitled to a summary judgment, which excuses them from further inquiry, even though Brick is not. Of

of his search of the McSurelys' home might be relevant to its investigation" (172 U.S.App.

D.C. p. ——, 521 F.2d p. 1047).

course plaintiffs must prove their cases through evidence which "does not draw in question the legislative acts of the defendant member[s] of Congress or [their] motives for performing them." [27]

---

27. *See United States v. Brewster,* 408 U.S. at 526, 92 S.Ct. at 2544, *quoting United States v. Johnson,* 383 U.S. at 185, 86 S.Ct. 749.